# HILLSBOROUGH,

## DECEMBER TERM, A. D. 1854.

---

### COOLIDGE, ADM'R. v. ALCOCK.

C., the administrator *de bonis non* upon the estate of the intestate, commenced an action of trover for sundry articles of personal property, in different counts, alleged to have been converted in the lifetime of the deceased, and also alleged to have been embezzled and converted after the decease of the intestate; and the defendant pleaded the general issue, and filed therewith a brief statement, alleging that the cause of action did not accrue within six years next before the commencement of the action ; and it was claimed, on the part of the plaintiff, that the cause of action arose from a fraud of the defendant, and that it had been fraudulently concealed from the plaintiff until within six years next before the commencement of the action ; and the plaintiff introduced a witness, who testified, among other things, that he was administrator on the estate of the deceased in April, 1826, and at that time had a list or memorandum of the articles sued for in the action, which was given him by the defendant, and that the defendant told him that he took the property from the residence of the deceased, after his death, the same being his own property, to pay his honest debts with, and that he summoned witnesses to prove that the defendant carried away property which did not belong to him, and made out nothing, but suspected an embezzlement; that the witnesses were summoned before the commissioner of insolvency upon the estate of the deceased, and the whole matter was examined into before him and fully discussed and considered, in the allowance of the claims of the plaintiff against the estate, and counsel was present at the hearing. It was *held* that, upon the foregoing uncontroverted evidence, the case was not taken out of the operation of the statute of limitations, and that the defendant was entitled to a nonsuit, upon motion, or to a verdict in his favor, by direction of the court.

TROVER. The writ was dated April 5, 1852.

The plaintiff, in different counts, alleged that the deceas-

ed, in his lifetime, to wit, on the 1st of February, 1824, was possessed of the property in question, which, after his decease, on the 1st of April, 1824, came to the possession of the defendant, who afterwards embezzled and converted the same to his own use; and that the plaintiff, as administrator of the deceased, on the 1st of April, 1824, was possessed of the same goods, which afterwards came into possession of the defendant, and the defendant embezzled and converted the same to his own use.

The articles for which the plaintiff finally claimed that the defendant should be charged, were as follows:—

> 22 pairs thick boots, valued at $2,00 per pair.
> 17 " thin " " " 2,75 " "
> 45 " thick shoes, " " 1,00 " "
> 32 " women's " " " 1,00 " "
> 24 " " " " " 1,00 " "
> 32 sides upper leather, " " 2,50 " side.
> 6 calfskins, " " 2,00 each.
> 750 lbs. sole leather, " " 24 cents per. lb.

The defendant pleaded the general issue, to which was appended a brief statement that the cause of action did not accrue within six years next before the action was commenced.

It appeared in evidence that the plaintiff's intestate, John Alcock, jr., and the defendant were brothers, and the plaintiff was the only son of the deceased.

John Alcock, jr., died suddenly, in February, 1824, from an accidental fall. Before his death he made a will, by which he appointed his father his executor, who, for a time, acted as such, and caused an inventory of the estate to be made, and a sale of the property, but for some cause which did not appear, the will was afterwards set aside and disallowed, and one Thomas Wilson of Hillsborough, was appointed administrator, who settled the estate, as was then

supposed, and he continued administrator until March, 1850, when he resigned, and the plaintiff was appointed.

The defendant, upon the petition of the administrator, charging him with embezzlement, was cited to appear before the court of probate, on the 3d day of July, 1851, and appeared and subscribed to a very extended examination upon interrogatories.

By his answers, it appeared that he was in business as a shoemaker at Hancock, and that he failed in business about the 1st or 2d of December, 1823. Before and on the 23d of November, 1823, the intestate had become indebted to the defendant in $426,95, very much the largest part of which was contracted in October and November, 1823, for hides, leather and shoes. The account is balanced by sundry credits, $38,28, by defendant's note $50, by intestate's note and cash $338,57, making $426,95. This account is entered on defendant's book at length, with a settlement in full, under date of November 23. The defendant stated that he made sales of his property to his father and his brother, the intestate, in anticipation of his failure; but said that they paid him a full consideration for the property, his father, by indorsements on notes due him, and his brother in notes to be used in settling with his creditors; and that there was no understanding that he was to receive back any part of the property sold to them, though he did buy back afterwards some part of what he had sold his father. He says no leather, boots, shoes, hides, or other personal property, was carried from Hancock to his brother's, at Deering, except those things which his brother paid him for; and that he never took, directly or indirectly, from his brother's any part of the property which had been carried there from Hancock. He further says that he carried, in notes and an account against his brother John's estate, certain sums, amounting, as appears from the list of claims filed in the probate office, to $168,93, and that he was allowed by the commissioner $17,21.

After stating, in answer to interrogatory 53, that he did not recollect any other sales of personal property to his brother, in November, 1823, than that stated in the account on his ledger of $426,95 ; he says, in answer to interrogatory 154, at an adjourned hearing, that he thinks his brother purchased other leather, and that he had found among his old papers, a paper in his own hand-writing, as follows :

" Nov. 22, 1823.   John Alcock to Mansel Alcock, Dr.
To 22 pairs thick boots, at $2,00 per pair,. . . . . . . . . .$44,00
" 17   "   thin   "   "   2,75   "   ". . . . . . . . . .  46,75
" 45   "   thick shoes,  "   1,00   "   ". . . . . . . . . .  45,00
" 32   "   women's "   "   1,00   "   ". . . . . . . . . .  32,00
" 24   "   "   "   "   1,00   "   ". . . . . . . . . .  24,00
" 32 sides upper leather, at $2,50 per side,. . . . . . ..  80,00
"   6 calfskins, at $2,00 each,. . . . . . . . . . . .. . . .  12,00
" 750 pounds sole leather, at 24 cents per pound,.. 180,00

463,75

Cr.        By your notes in part,.. . . . . . . . . . . . .$400,00."

He says that he has no recollection why this leather, appearing to be sold the day before the settlement, was not entered on the ledger.   He has not seen the paper till within a few days.   To the best of his knowledge, it is a record of sale actually made to his brother.

Upon the account settled November 23, 1823, were the following charges in September and October :—

To 21¾ pounds sole leather,. . . . . . . . . . . . . . . . . . . . . .$5,43
" 78   "   "   "   . . . . . . . . . . . . . . . . . . .  19,50
" 76   "   "   "   . . . . . . . . . . . . . . . . . . .  19,00
" 80   "   "   "   . . . . . . . . . . . . . . . . . . .  20,00
"   2 sides upper leather, at $3,34 each,. . . . . . . . . . .   6,68
"   3   "   "   "   "   2,50   "   . . . . . . . . . .   7,50
"   3   "   "   "   "   3,50   "   . . . . . . . . . .. .  10,50

Coolidge *v.* Alcock.

" 2 " " " " 3,75 " ........... $7,50
" 5 " " " " 3,00 " ........... 15,00

and after November 13th,—

To 400 pounds sole leather,.....................100,00
. " upper leather..................................... 20,00
" 33 pairs shoes,.................................... 38,50
" 18 " thick boots,........................... 36,00
" 12 " thin " ............................ 36,00
" 20 " women's shoes,........................ 20,00
" 14 " walking " ..................... 17,50

The plaintiff then put in evidence a copy of the inventory of the deceased's estate, as shown to the appraisers by Mansel Alcock, the defendant's father, the executor. In this were the following entries :—

253 pounds sole leather at 24 cents,............... $60,72
6 calfskins, 12s. each,........................ 12,00
27½ sides of neats leather, at 15s................. 68,75
33 pairs thick shoes,.......................... 33,00
9 " thick boots,............................ 18,00
12 " thin " ......................... 33,00

being the only articles of leather, or shoes, boots, &c., appraised, to show that only a part of the property conveyed to John by Mansel was included in the inventory.

Thomas Wilson testified that he was appointed administrator of the estate of John Alcock, jr., in May, 1825. The estate had been partly settled by Mansel Alcock, the defendant's father. He (Wilson) resigned the trust March, 1850. No personal estate of John Alcock ever came into his possession.

A paper, in pencil, was shown to the witness, as follows :—

" 22 thick boots.
17 thin.
45 pairs thick shoes.
32 women's.
24 morocco.
18 sides upper leather.
6 calfskins.
14 sides upper leather.
750 pounds sole leather."

The witness further testified : " It is in my hand-writing. I was present a part of the time, while Mansel Alcock, the defendant, was under examination at the probate court; but not when he stated the sale of that property. I heard of it next day. In 1849, Mark Alcock spoke to me of this sale, which was the first intimation I ever had of the sale."

He further said : " I cannot tell when the pencil memorandum was made. Mansel Alcock, the executor, settled his account at a probate court, at Francestown, August 23, 1825. The commissioner of insolvency on the estate of John Alcock, jr., sat at my house in Hillsborough, in April, 1826. At one or the other of those times I put down that memorandum. I called on Mr. Ansel Alcock, the defendant, to give me information of these articles. He gave me off this list. He said he took the property from John's, to pay his honest debts with, I understood, after his death; am not particular about that. I summoned witnesses to prove about the property. I got no information in regard to it till 1849. When I got through in 1826, I did the memorandum up with other papers, and it has remained there since, till lately."

On cross-examination, this witness stated " this conversation was at Francestown, or at my house. I think there was conversation at both places. I cannot say at which the memorandum was made. It is so long since, I cannot recollect. I talked with Mansel Alcock, the defendant, and

his father. I suspect I had conversation with Mansel at Francestown and Hillsborough both. I cannot say whether he told me he took it away at Francestown or at Hillsborough. He said he had taken some property away. I cannot tell what he said. He said it was his own property, and he took it to pay his honest debts. I summoned witnesses to show he had carried away property that did not belong to him, but did not make out any thing. I suspected an embezzlement. I summoned Foster, Clement and Howard. I did not summon Alexander Robbe. They were summoned before Esquire Story, who was commissioner on the estate. The whole matter was examined into before the commissioner. Mr. Walker was attorney for Mansel. The talk I had with the defendant at Hillsborough was, I think, the first Saturday in April, 1826. The probate court at Francestown was August 23, 1825, when the old gentleman settled. I summoned the witnesses just before April. I cannot say if I made those minutes at Francestown. I did not make any minute of the conversation, or whether he took them before or after the death of John, or at the time of the conversation. I made the memorandum at one of these two places; I am confident of that. I happened not to put a date to it. A number of persons were present, both at Hillsborough and Francestown. I did this paper up with others, and they were not opened till 1848. The commissioner sat at my house. I had the conversation about this property before the commissioner, in April, at my hall. I dont know if the commissioner heard it. Mansel said it was his own property, and he took it to pay his debts. It was discussed and considered in the allowance of claims against the estate. I commenced a suit against Mansel Alcock, as administrator, at April term, 1850. It was brought to recover boots, shoes, leather and money. I cannot tell if the writ stated the particular things for which it was brought. I think Mr. Ayer, my attorney, saw that paper. It was brought on account of leather and money,

both. I am confident of that. I resigned my administration March, 1850. I think Mansel Alcock said he took the property after John's death. I suspect it was afterwards : am pretty sure it was after I tried to pursue him. I summoned witnesses to prove about it before the commissioner. His attorney said Mansel Alcock took the property and paid his debts with it, like an honest man. I cannot swear the attorney said he took it after the death of John. I resisted the allowance of the defendant's claim at the hearing before the commissioner."

On further examination in chief the witness said: " I think Mansel said he took the property after John's death. The first I knew of Mansel's selling the property to John was at the disclosure."

The plaintiff here rested his case ; and the defendant then moved for a nonsuit. The court declined to order a nonsuit, to which the defendant excepted. Some testimony was then offered by the defendant, tending to show that others, who were present at the hearing before the commissioner, heard no such statements made by Mansel Alcock as were testified to by Mr. Wilson.

The case was discussed by the counsel and committed to the jury.

The court instructed the jury that if the cause of the plaintiff's action arose from a fraud practised by the defendant upon the plaintiff, and the fraud was not discovered until within six years before the action was brought, this is a sufficient answer to a plea of the statute of limitations.

That if the cause of action in favor of the plaintiff against the defendant had been fraudulently concealed by the defendant, until within six years before the action was brought, that is a sufficient answer to the plea of the statute of limitations. That if the cause of action is known to the plaintiff more than six years before the action is brought, or if such facts and circumstances are within his knowledge, as

would naturally lead to inquiry into the matter, the statute of limitations, notwithstanding the fraud, would be a bar.

To these instructions the defendants excepted.

The jury found a verdict for the plaintiff for $463,75, with six years interest, subject to the opinion of the court upon the question of interest, also, which the defendant moved might be set aside and a new trial granted, by reason of said several rulings and exceptions.

*Morrison, Fitch & Stanley,* for the plaintiff.

The plaintiff's cause of action arose from a fraud practised on him by the defendant, and the fraud was not discovered till within six years before the action was brought, and such facts and circumstances were not till within that time within his knowledge as would naturally lead to inquiry into the matter. Upon the facts thus found, is the statute of limitations a bar to the action? In such a case, when does the statute begin to run? We contend not until the fraud is discovered, or such facts and circumstances come to the knowledge of the plaintiff as would naturally lead him to investigate the matter. In the case of *Hovenden* v. *Lord Annesley,* 2 Sch. & Lef. 607, Chancellor *Redesdale,* in commenting upon *Booth* v. *Lord Warrington,* 1 Bro. P. Cases, 455, says: "The decision, in that case, was of this description, that as fraud is a secret thing and may remain undiscovered for a length of time, during such times the statute of limitations shall not operate, because until discovered the title to avoid it does not completely rise." See also *South Sea Company* v. *Wymondsell,* 3 P. Williams 143.

That this is the construction to be put upon the statute, we understand to be sustained by the best authorities. But it is contended that the courts of chancery are not bound by the statute of limitations, while courts of law are. That the statute is equally binding in courts of chancery as in courts of law, see *Hovendon* v. *Annesley,* 2 Sch. & Lef.

607, and authorities there cited. The court, in that case, decide that " upon all legal titles and legal demands, courts of eqûity are bound by the statute of limitations." In chancery, the statute of limitations is pleadable as well as at law, and whether the statute, in cases of fraud, shall be so construed as that the right of action shall be considered to have accrued at the time of the commission of the fraud, or at the time of its discovery by the injured party, courts of equity have no more power to decide than courts of law. It seems to us that this power is equally applicable to the one court as to the other, and that no sound reason can be urged to the contrary. We are not aware of any direct decision upon this point, in the common law courts of England, but there are various indirect authorities, which strongly indicate that where there is concealed fraud on the part of the defendant, the plaintiff will not be barred by the statute, when the point is properly raised. *Short* v. *McCarthy*, 3 Barn. & Ald. 436 ; *Clark* v. *Hougham*, 3 Dowl & Ry. 330 ; *Brown* v. *Howard*, 2 B. and Bing. 73, 2 Ves. jr. 280 ; *Pickering* v. *Stamford*, 2 Saund. 63, c. 1. note ; *Bruce* v. *Holbrick*, Dowl 654. Upon this last case, see comments of Mr. Justice *Story*, in *Sherwood* v. *Sutton*, 5 Mason 143.

But in this country there is, as we think, the great weight of authority in our favor. *First Mass. Turnpike* v. *Field &amp; a.*, 3 Mass. Rep. 201 ; *Homer* v. *Fish &amp; a.*, 1 Pick. 435 ; *Wells* v. *Fish &amp; a.*, 3 Pick. 475 ; *Farnam* v. *Brooks*, 9 Pick. 212 ; *Jones* v. *Conoway*, 4 Yeates 109 ; *McDowell* v. *Young*, 12 Serg. & Rawle 128 ; *Rush* v. *Barr*, 1 Watts 110 ; *Pennock* v. *Freeman*, 1 Watts 494 ; *Harrisburg Bank* v. *Foster*, 8 Watts 12 ; *Frankfort* v. *Markley*, 1 Dana 373 ; *Cole* v. *McGlathry*, 9 Greenl. 131 ; *Raymond* v. *Simonson*, 4 Black. 85.

In this case, it was held that the statute begins to run only from the ㊀ime the fraud is fully developed and disclosed, so as to enable the injured party to perceive the nature and extent of the fraud. A like doctrine is held in

*Mitchell* v. *Thompson,* McLean 85, and in *Sherwood* v. *Sutton,* 5 Mason 143. The construction that we contend for seems to us to be the only just one, and that courts of law, in holding it, adhere as strictly to it as in many cases in assumpsit, and that in neither case is there an overruling of the statute, but the placing of such a construction upon it, as to maintain justice and prevent the defendant from setting up his own fraud in bar of the plaintiff's clearest rights.

As to the next position of the defendant, that the great lapse of time is of itself a bar, if the statute of limitations itself does not apply, it may be true when the cause of action does not arise from a fraud, but when the cause of action, as in this case, arises from a fraud practised upon the plaintiff by the defendant, and the action brought upon the discovery of the fraud, such, we submit, is not the law.

No length of time can bar a fraud, but is only a circumstance to be taken into consideration by the court in forming its judgment, and the proof of fraud must be precise in its character. *Pickering* v. *Stamford,* 2 Ves. jr. 280. This question has been recently settled in England, upon appeal to the House of Lords, in the case of *Irvine or Douglass &c. a.* v. *Kirkpatrick,* 3 L. & E. 17.

The question involved in the defendant's third position has been settled by the verdict. It was a question of fact, and as such was submitted by the court to the jury, and we contend it was properly submitted to them, and that their finding is conclusive upon that point. The authorities cited by the defendant, on this head, do not seem to us to be in point.

The fourth position of the defendant is not well founded. The commissioner of insolvency had no authority to investigate and try charges of embezzlement in favor of the estate. His authority extended only to receive, examine, adjust and allow the claims of creditors, and not to try and determine torts of any kind in favor of the estate. It appears that when the defendant was questioned as to this

property, he fraudulently stated that it was his, and thus concealed his fraud.

*B. F. Ayer*, for the defendant.

The first question to which we propose to call the attention of the court is this : Can a plaintiff, in an action at law in this State, set up a fraud on the part of the defendant, to take a case out of the operation of the statute of limitations ?

The court instructed the jury that if the cause of the plaintiff's action arose from a fraud practised by the defendant upon the plaintiff, and the fraud was not discovered until within six years before the action was brought, this is a sufficient answer to a plea of the statute of limitations. We maintain that this ruling was incorrect.

Our statute enacts that all actions of this description shall be brought within six years after the cause of action accrued, and not afterwards. There are three savings made, in favor of infants, married women and insane persons, who are authorized to commence any personal action within two years after their disability is removed ; and there is a further provision that if any defendant is absent from and residing out of the State, at the time the cause of action accrues, or afterwards, the time of such absence shall be excluded in the computation of the time before limited. Rev. Stat. ch. 181. The same provision, substantially, has been in force in this State for more than fifty years. Thus the statute not only provides that actions like this shall be brought within six years after the cause of action accrues, but also expressly declares that they shall not be brought after that period. Courts of law are bound by the statute, and it would be a usurpation of legislative authority, were the court to exempt any case from its operation which is not included in the number of exceptions made by the statute itself.

In this case the cause of action accrued upon the alleged

conversion of the property. All the authorities show that, in trover, the cause of action accrues upon the conversion. The statute of limitations, then, began to run from the time of the alleged conversion in 1824; 2 Saund. on Pl. & Ev. 645; Angell on Limitations 41; *Batley* v. *Faulkner*, 3 Barn. & Ald. 288; *Short* v. *McCarthy*, 3 Barn. & Ald. 626; *Granger* v. *George*, 5 Barn. & Cress. 149; *Fletcher* v. *Fletcher*, 7 N. H. Rep. 452; *Kelsey* v. *Griswold*, 6 Barb. S. C. Rep. 436.

It is urged, however, by the plaintiff that his cause of action arose from a fraud practiced by the defendant, and was not discovered until within six years before the action was brought, and that his cause of action ought not to be considered as accruing until the fraud was discovered.

It is not disputed that a few cases may be cited which seem to countenance this position in part, but it is believed that not more than two or three decisions can be found in any court of common law, either in England or in this country, in which this doctrine is recognized, and these are completely overborne by the general current of authorities in the other direction.

The first case at common law in the English courts, in which such a doctrine was intimated, for it was no more than an intimation, was the case of *Bree* v. *Holbeck*, Doug. 654, decided in the year 1781. In giving a decision in this case, Lord *Mansfield* is reported to have said : " There may be cases, too, which fraud will take out of the statute of limitations." This question, however, was one which did not arise in the case. It was not a point decided. The remark was a mere *dictum*, and cannot be regarded as authority. This is the view that has been taken of it by several of the most respectable courts in this country, and one of them has said in reference to it, that " all which can be derived from that case is, that Lord *Mansfield* was not then prepared, upon the spur of the occasion, to deny the doctrine totally, absolutely and without qualification. The

case did not require a decision upon that point, and the doctrine was not recognized.    He admits, ' there may be cases which fraud will take out of the statute ;' but the case, instead of sustaining the doctrine as one of universal, or even general application, proves the reverse."    *Smith* v. *Butler*, 9 Vt. Rep. 110.    The supreme court of New York, in *Troup* v. *Smith*, 20 Johns. 33, also referring to this remark of Lord *Mansfield*, say " that the *dictum* of Lord *Mansfield*, in *Bree* v. *Holbeck*, is the only instance in which such a position was ever advanced in Westminster Hall ; and when it is further considered that his lordship had an inclination to trench on courts of equity, that mere *dictum* cannot be regarded as authority."

No subsequent decision can be found in the English reports of cases at common law in which this *dictum* of Lord *Mansfield* has been confirmed.    The case of *Clark* v. *Hougham*, 2 Dowling & Ryland 330, has been sometimes cited as sustaining that principle, but the only question that arose in that case was whether the defendant had made a new promise or an acknowledgment.    It was distinctly stated by all the judges, that the question how far fraud might prevent the operation of the statute of limitations did not arise in that case. Mr. Justice *Best* was the only one who discussed the matter of fraud.    He said, " I agree that we are not called upon to decide in this case whether fraud, *per se*, is an answer to the statute of limitations, but I think if there had been a special replication of the fraud put upon this record, the defendant's second plea would have been answered, and that we might have so held without disturbing any of the former decisions upon that subject.    In all those cases the fraud was complete, and the cause of action arose above six years before action brought ; but here the fraud is continued to a period far within six years.    The rule of construction applicable to this statute in courts of law and in courts of equity, is widely different ; and we must abide by our own rule of construction ; and wherever we find an acknowledgment

that the debt is unpaid, must consider the statute as defeated."

This is a decision strongly relied upon by Mr. Justice *Story*, in the case of *Sherwood* v. *Sutton*, which will be hereafter noticed; but it will be seen from the above that this case, instead of sustaining the doctrine suggested by Lord *Mansfield*, in *Bree* v. *Holbeck*, is rather an authority to prove that if the fraud is not continued to within six years, it is, at common law, barred by the statute. The same opinion was advanced by Mr. Justice *Best*, in still stronger terms, in the previous case of *Battley* v. *Faulkner*, 3 Barn. & Ald. 288. This was an action of assumpsit upon a contract to sell wheat of a particular quality, and the wheat delivered was, in fact, of a different quality. It was held, that the breach of contract having occurred more than six years before suit brought, the defendant might properly plead the statute of limitations. Justice *Best*, in giving his opinion, held the following language: " It is said, however, that the plaintiff might have adopted a different form of action, and proceeded for the fraud. If, however, the action had been founded on fraud, it seems to me that the fraud was complete when the wheat was forwarded. The object of the statute of limitations was to prevent persons from being charged with claims, who, in consequence of the lapse of time, might have no means of proving a discharge." This decision is referred to and approved by Mr. Justice *Park*, in *Brown* v. *Howard*, 2 Brod. & Bing. 73. In giving his opinion in that case he said: " This is a case of such hardship on the plaintiff, that the court would, if it were possible, get out of the course of the decisions. But they cannot set aside the express words of the statute, or the decisions which seem exactly in point." He then referred to the words of the statute, and continued: " In *Battley* v. *Faulkner*, the point was well put by one of the judges, the only question is, when the cause of action accrued; for the statute then attached. I think the cause of action accrued

the moment the defendant failed to perform that which he agreed to do."

It is believed that all the English cases at common law directly bearing upon this point have now been noticed, and they prove conclusively that the doctrine contended for by the plaintiff in this case has never received the sanction of any court of common law in that country from which we derived our jurisprudence.

We now come to the examination of the American cases bearing upon this point. It would seem that in Massachusetts and Pennsylvania a doctrine has prevailed different from that of most of the other States, where this subject has been discussed. The leading case in Massachusetts, on which all the subsequent decisions of this character rest, is that of *The Massachusetts Turnpike Company* v. *Field,* 3 Mass. Rep. 201. In this case it was held, that a fraudulent concealment by the defendant that a cause of action had accrued to the plaintiff was a good replication to a plea of the statute of limitations. This decision does not, however, go to the extent of the judge's charge to the jury in the case at bar, for it was put distinctly upon the ground that the causes of action in that case were fraudulently concealed by the defendants themselves from the knowledge of the plaintiff until the time fixed by the statute of limitations had run out.

The same principle has been adopted by the courts of Pennsylvania; but there is no case reported in which the subject seems to have met with much discussion. The decisions are all made on the authority of the case *Mass. Turnpike Co.* v. *Field.* In Maine, this doctrine has been recognized only to a limited extent. In *Cole* v. *Mc Glathey,* 9 Greenl. 131, it was held that in order to take the case out of the statute on this ground, there must be proof of actual fraud and concealment by the party to be charged. The principle to this extent has also been admitted by Mr. Justice *Story,* in the case of *Sherwood* v. *Sutton,* 5 Mason 141,

decided in the U. S. circuit court for this district, in the year 1828. This was an action on the case for a deceitful representation, to which the statute of limitations was pleaded. The plaintiff replied that there was a fraudulent concealment of the deceit until within six years. It was held that this replication was a good answer to the plea. In giving the decision, the court were particular to remark that it was " material to state that the point was not whether mere ignorance of the fact on the part of the plaintiff ought to remove the bar, but whether this ignorance resulting from the fraudulent concealment of the fact by the defendant, ought to have that effect."

Mr. Greenleaf, in his work on Evidence, vol. 2, § 448, who adopts the doctrine held by the court in Mass., lays it down that it must be alleged and proved, not only that the plaintiff did not know of the existence of the cause of action, but that the defendant had practised fraud, in order to prevent the plaintiff from obtaining that knowledge at an earlier period.

Now, even if this doctrine be correct, it is submitted with great confidence, that it entirely fails to sustain the plaintiff's case. It is not charged, and cannot be contended in the case at bar, that there has been any fraudulent concealment by the defendant. There is no pretence that there was more than one fact relating to the alleged conversion of this property, which the plaintiff had not full knowledge of at the time. The former administrator and sole witness for the plaintiff, testifies, that the first he knew of the defendant's selling the property to the intestate was in 1849, when Mark Alcock spoke to him about it. This is the only fact upon which it is pretended that any additional information has been obtained since the year 1826. It does not appear that any attempt was made during this interval to procure information, or that any pains had been taken, or even any disposition manifested by the defendant to conceal or withhold it. These cases, relied upon by the defendant, therefore, we contend, do not go far enough to sustain this ac-

tion. They certainly do not go to the extent of the judge's charge, for the jury in this case were instructed that if the cause of the plaintiff's action arose from a fraud practised by the defendant upon the plaintiff, and the fraud was not discovered until within six years before the action was brought, this is a sufficient answer to a plea of the statute of limitations.

But there is a broader view to be taken of this question. It is that the doctrine laid down in the cases just adverted to is unsound and untenable. It has, unquestionably, been borrowed from the courts of chancery, which do not consider themselves bound by the statute of limitations, any further than they have chosen to adopt its provisions. For a long period courts of chancery have administered relief in cases of fraud and mistake both, notwithstanding the statute of limitations would bar any investigation in a court of law. 2 Story Eq. Jur. § 1521 a. There is the less objection to this practice in courts of equity, for the reason that the defendant has by his answer an opportunity to purge himself of the fraud imputed to him, and the testimony of a single witness is not held sufficient to sustain the charge, against the defendant's denial under oath. As this practice does not prevail in actions at law, there would be much greater liability to mistake and consequent injustice, if courts of law were authorized to enter into the investigation of stale and antiquated claims. Courts of law, accordingly, have never pretended to interpose against the operation of the statute in cases of mistake, though they have, in a few instances, to a certain extent, in the case of frauds. There would seem, however, to be as much propriety in interfering in the one case as in the other.

Of the fact that the doctrine in question has been derived from the chancery courts there can be no question. It is admitted in several of the cases before referred to. In *Mass. Turnpike Co.* v. *Field*, it was distinctly stated by the court, that the principle there laid down was " settled in

chancery, and chancery will not differ from the common law in the construction and application of a statute." In *Sherwood* v. *Sutton*, Judge *Story* based his decision principally upon the authority of chancery cases, and also remarked at the outset, that he was influenced in deciding that case as he did, by " this consideration of no inconsiderable weight, that as there is no State court in the judicial establishment of New Hampshire which possesses general equity powers, the remedy, if it is to be administered at all, must be administered in such cases through the instrumentality of a court of law; and hence the doctrines of courts of equity, where they are susceptible of incorporation into remedies at the common law, find a more ready admission into State courts than perhaps would occur if courts of chancery had an independent existence."

We now proceed to prove, from the highest authorities, both in equity and common law, that this doctrine of the courts of chancery is not applicable in courts of law, which are bound by the statute.

It may be observed, in the first place, that in most if not all of the chancery cases in which it has been held that fraud is a bar to the operation of the statute of limitations, the decisions have been put distinctly upon the ground that the statute is not binding upon courts of equity, and that they, therefore, have power to relieve against it, though the rule would confessedly be otherwise in a court of law. See *Ex parte, Bolton,* Mont. & Ayrton's Bank. Rep. 60; *Brookbanks* v. *Smith,* 2 Younge & Collyer 58.

In *Crane* v. *Prathee,* 4 J. J. Marshall, 75, a case in equity, the court held that in chancery the statute did not commence running until discovery of the fraud or mistake, as the statute did not in terms apply to courts of equity, though the rule would be otherwise in actions at law; and in *Pyle* v. *Beckwith,* 1 J. J. Marshall, 445, which was a suit at law brought for an alleged fraud in the sale of land, it was held that at law the statute of limitations runs from the commit-

ting of the fraud, but that in equity the rule was otherwise. There the limitation takes date from the discovery of the fraud. To the same effect is the case *Prescott* v. *Hubbell*, 1 Hill's Chancery Rep. 210, where it was distinctly asserted by the court, that the legal cause of action is regarded as accruing from the time the fraud was perpetrated; the equitable cause of action from the discovery. See, also, *Clark* v. *Hougham*, 3 Dowl. & Ry. 330; *Troup* v. *Smith*, 20 Johns. 33; and 2 Schoales & Lefroy 634.

The same view of this subject, precisely, is taken by the superior court of Vermont, in *Smith* v. *Butler*, 9 Vt. Rep. 110; also, by the superior court of North Carolina, in *Hamilton* v. *Shepherd*, 3 Murphy 115; and *Barnes* v. *Williams*, 3 Iredell 481; and by the superior court of Ohio, in *Fee* v. *Fee*, 10 Ohio Rep. 469.

There is much truth in the remark of Chief Justice *Best*, in *A' Court* v. *Cross*, 3 Bing. 331, that "long dormant claims have often more of cruelty than of justice in them." The statute of limitations was enacted for the reason that time obliterates evidence. It is a statute of repose, and is every where admitted to be a wise and humane regulation. See also *Smith* v. *Butler*, 9 Vt. Rep. 110. "If we could engraft such a provision upon the statute as is claimed by the construction contended for, we should destroy its practical utility and defeat its great purpose."

Such a construction is wholly repudiated and disapproved by the established doctrine in Vermont, and in New York by repeated decisions, in Virginia, North Carolina, South Carolina, Ohio, Kentucky, and several other States. *Troup* v. *Smith*, 20 Johns. 33; *Oothout* v. *Thompson*, 20 Johns. 277; *Leonard* v. *Pitney*, 5 Wend. 30; *Allen* v. *Mille*, 17 Wend. 202; *Bucklin* v. *Ford*, 5 Barb. 393; *Kelsey* v. *Griswold*, 6 Barb. 436; *Cook* v. *Darby*, 4 Munford 444; *Hamilton* v. *Shepherd*, 3 Murphy 115; *Prescott* v. *Hubbard*, 1 Hill's Ch. Rep. 210; *Miles* v. *Berry*, 1 Hill 298; *Fee* v. *Fee*, 10 Ohio Rep. 469; *Pyle* v. *Beckwith*, 1 J. J. Marshall 445.

It has, for many years, been a matter of serious regret with all the most eminent judges and jurists both in England and the United States, that so many constructive innovations as are now really well established, should have been engrafted by the courts upon the statute of limitations. *Hillings* v. *Shaw*, 7 Taunt. 608; *Baille* v. *Sibbald*, 15 Ves. 185; *A' Court* v. *Cross*, 3 Bing. 331; *Bell* v. *Morrison*, 1 Peter's 360; *Green* v. *Johnson*, 3 Gill. & Johns. 394.

The court in this State have never discussed, so far as we have been able to discover, the particular question under consideration. A disposition has rather been evinced to admit no exceptions to the statute, except those that have been clearly and fully established by the force of prior adjudications. *Exeter Bank* v. *Sullivan*, 6 N. H. Rep. 124; *Atwood* v. *Coburn*, 4 N. H. Rep. 315; *Manning* v. *Wheeler*, 13 N. H. Rep. 436; *Ventris* v. *Shaw*, 14 N. H. Rep. 422.

If, however, the court should be inclined, contrary to our expectations, to adopt the doctrines of the courts of chancery to its fullest extent, and hold that fraud not discovered until within six years before action brought, is a sufficient answer to the statute of limitations, we then contend, in the second place, that the great lapse of time in the present case is of itself a bar to this action, even if the statute of limitations does not apply.

Courts of equity, as it has been already shown, do not consider themselves bound by the statute of limitations, yet they do always recognize the justice and necessity of fixing some limit within which investigations of this character are required to be made. It is laid down in Lewin on Trusts and Trustees 617, that courts of equity, " after great length of time, will *presume* some act to have been done, which, if done, is a bar to the demand. The period at which the court raises this presumption depends upon the circumstances of the case. As a general rule, the court presumes, after a lapse of twenty years." The same principle is asserted by Judge *Story*, in 2 Story's Eq. Jur. § 1520. See

also the following authorities, viz: *Smith* v. *Clay*, reported in a note in 3 Brown's Chan. Cases 639; *Eldridge* v. *Knott*, Cowper 214; *Jones* v. *Tuberville*, 2 Ves. Jr. 13; *Prevost* v. *Graty*, 6 Wheaton 417; *Mitchell* v. *Thompson*, 1 McLean 103; *Piatt* v. *Vattier*, 1 McLean 161 and 9 Peters 405; *McKnight* v. *Taylor*, 1 Howard U. S. S. C. Rep. 161; *Gregory* v. *Gregory*, Cooper's Rep. 201; *Johnson* v. *Johnson*, 5 Alabama Rep. 90; *Farnam* v. *Brooks*, 9 Pick. 212.

In the case at bar, it appears from the evidence disclosed upon the trial, that the cause of action arose thirty years ago, since which time a whole generation has passed away to the tomb. Some of the actors in it are now dead, and others who knew all about the occurrence at the time have lost all recollection upon the subject. We submit, there-fore, that it would be in the highest degree unjust to this defendant, and contrary to the plainest dictates of public policy, to allow, at this late day, an investigation to be made of a transaction which no one can positively assert was fraudulent, and which has so long been buried in oblivion.

We contend, in the third place, that it appears from the plaintiff's own showing, that sufficient facts and circum-stances were within his knowledge more than six years be-fore this action was brought, as would naturally lead to in-quiry, and, therefore, the statute of limitations is a bar, and this is a matter of law to be decided by the court.

At the trial below, it was left to the jury to say whether the facts and circumstances within the plaintiff's knowledge more than six years before the action was brought, were suf-ficient to put him upon inquiry; whereas we contend that as there is no conflicting evidence, and no dispute as to what those facts and circumstances are, this question should be decided by the court. *Farnam* v. *Brooks*, 9 Pick. 212; *Cole* v. *McGlathry*, 9 Greenl. 131; *Mitchell* v. *Thompson*, 1 McLean 103; *Piatt* v. *Vattier*, 1 McLean 161 and 9 Peters 405, and *McKnight* v. *Taylor*, 1 Howard U. S. S. C.

Rep. 161, are also authorities to the same point.    See also 2 Story's Eq. Jur. § 1520.

In the fourth place, we contend that this matter has been already adjudicated, before a tribunal having jurisdiction of the controversy, and the decision of that tribunal is conclusive upon the parties.

It appears that this estate was administered upon as an insolvent estate.    By the act of July 2, 1822, which was in force at the time this estate was settled, it was made the duty of the commissioner to receive, examine and allow all *bona fide* demands which the deceased owed, that should be exhibited to him, and where there were mutual demands between the deceased and any person claiming as creditor, which, if due, might be legally or equitably offset against each other, to consider such mutual demands, and to allow only to such creditor the balance justly due.    There was also in the same act a farther provision, that if the executor or administrator should be of opinion that the commissioner had allowed a demand against the estate which ought not to be allowed, or had allowed a larger sum than was justly due, he could appeal from the decision of the commissioner to the superior court.    If no appeal was taken, the commissioner's decision was, of course, final.

Now we contend that it appears conclusively from the facts reported in the case, which are not controverted by the plaintiff, that this matter has once been legally adjudicated before the commissioner, and, as no appeal was taken from his decision, that decision is final and conclusive upon the parties.    It has been so expressly decided by the courts both in New Hampshire and Massachusetts.    *Boardman* v. *Smith*, 4 Pick. 212; *Horner* v. *Fish*, 1 Pick. 435; *Goodall* v. *Marshall*, 14 N. H. Rep. 168.

WOODS, J.    The verdict must be set aside.    Here was no concealment of the cause of action.    It appears that in 1826, such facts and circumstances came to the knowledge

of the person who was then the administrator of John Al-
cock, jr., as led him to investigate the question of the em-
bezzlement which constitutes the ground of the present
action. He had such information as to existence of the
cause of action, as induced him to institute a legal inquiry
for the purpose of establishing the fact. At the investiga-
tion it appeared that the property was taken by the defend-
ant; the taking was in fact admitted by him; and he justi-
fied the act of taking as a thing which he had a right to do.
Upon the showing of the plaintiff himself, the cause of this
action was not unknown to him, and of course it was not
concealed by the defendant. It was not only known to him,
but acted upon by him. The case shows most distinctly
full knowledge of the cause of action, such as it was, and
an unsuccessful attempt by the administrator to avail him-
self of it. In such a state of the case, the statute of limi-
tations must have its ordinary operation. It is the want
of knowledge on the part of the plaintiff, or the fraudulent
concealment of the cause of action on the part of the de-
fendant, which alone relieves against the statute bar. Here
neither the one nor the other is shown. The want of suf-
ficient competent evidence to establish the cause, when
known to the plaintiff, cannot defeat the operation of the
statute. Whatever may be the cause of action, even though
it may arise out of a fraud practiced upon the plaintiff, yet,
whenever the cause shall come to the knowledge of the
party defrauded, there can be no doubt that the statute of
limitations will run from that period, and that it will form
a complete bar to the action, after the lapse of the period
prescribed for commencing the action. The evidence to
show an investigation into the merits of the present contro-
versy in 1826, came from a witness of the plaintiff, and was
not controverted. Upon the plaintiff's own showing, then,
the statute bar set up was a perfect defence to the action,
and we see no reason why the defendant was not entitled
to a verdict in his favor, by direction of the court, or to a

Coolidge *v.* Alcock.

nonsuit.   The case showed no evidence of a concealment of the cause, but the contrary thereof.

It is not necessary to decide the other questions raised by the case and discussed at the bar.   The verdict should clearly be set aside, and a

*New trial granted.*